Jon B. Fougner (State Bar No. 314097)
jon@fougnerlaw.com
600 California Street, 11th Floor
San Francisco, California 94108
Telephone: (415) 577-5829
Facsimile: (206) 338-0783

[Additional counsel appear on signature page]

*Attorneys for Plaintiff Deborah Schick and the Proposed Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DEBORAH SCHICK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SELECTQUOTE INSURANCE SERVICES, YASHA MARKETING LLC, and DATALOT, INC.,<br><br>Defendants. | Case No. 3:19-cv-04902-LB<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTION AND DAMAGES**<br><br>**Class Action**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Deborah Schick, by her undersigned counsel, for this class action complaint against Defendants SelectQuote Insurance Services ("SelectQuote"), Yasha Marketing LLC ("Yasha"), and Datalot, Inc. ("Datalot"), and their present, former, and future direct and indirect parents, subsidiaries, affiliates, agents, and related entities, alleges as follows:

### I. INTRODUCTION

1. <u>Nature of Action</u>: This case arises from Defendants' unsolicited telemarketing in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

2. The telemarketing was conducted using an automated telephone dialing system ("ATDS"), a tactic among those that inspired Congress to enact the TCPA and that most infuriate people to this day.

3. The telemarketing targeted, among other phone lines, cellular telephones and numbers listed on the National Do Not Call Registry ("NDNCR").

4. For every 7,000,000 robocalls, there's only one TCPA lawsuit in federal court. *Compare* Herb Weisbaum, *It's Not Just You—Americans Received 30 Billion Robocalls Last Year*, NBC News (Jan. 17, 2018), https://www.nbcnews.com/business/consumer/it-s-not-just-you-americans-received-30-billion-robocalls-n838406 (30.5 billion robocalls); *with* WebRecon, *WebRecon Stats for Dec 2017 & Year in Review* (last visited Oct. 29, 2018), https://webrecon.com/webrecon-stats-for-dec-2017-year-in-review/ (4,392 TCPA complaints).

## II.   PARTIES

5. Plaintiff is a natural person.

6. Plaintiff resides in Maricopa County, Arizona.

7. SelectQuote is a corporation.

8. SelectQuote is a California corporation.

9. SelectQuote's principal place of business is 595 Market Street, 10th Floor, San Francisco, California 94105.

10. SelectQuote does business throughout the United States, including in California, in this District.

11. Yasha is a limited liability company.

12. Yasha is a Florida limited liability company.

13. Yasha's principal place of business is 4801 Linton Boulevard, Suite 11A, Delray Beach, Florida 33445.

14. Yasha has informed the State of Florida that its registered agent is Daniel J. Feldman of 4801 Linton Boulevard, Suite 11A, Delray Beach, Florida 33445.

15. Yasha does business throughout the United States, including in California, in this District.

16. Datalot is a corporation.

17. Datalot is a Delaware corporation.

18. Datalot's principal place of business is 65 Jay Street, Floor 2, Brooklyn, New York 11201.

19. Datalot does business throughout the United States, including in California, in this District.

### III.   JURISDICTION AND VENUE

20. <u>Jurisdiction</u>: This Court has federal-question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

21. <u>Personal Jurisdiction</u>: This Court has personal jurisdiction over Defendants because:

    a.    SelectQuote's principal place of business is in California;

    b.    the telemarketing at issue was directed from that California principal place of business; and

    c.    the telemarketing at issue targeted a California area code.

22. <u>Venue</u>: Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to Plaintiff's claims—namely, the direction of the illegal telemarketing from SelectQuote's office—occurred in this District.

23. <u>Intradistrict Assignment</u>: Assignment to this Division is proper pursuant to Civil Local Rule 3-2(c) because a substantial part of the events or omissions that give rise to Plaintiff's claims—namely, the direction of the illegal telemarketing from SelectQuote's office—occurred in San Francisco.

### IV.   FACTS

**A.   The Enactment of the TCPA and the FCC's Regulations Thereunder**

24. <u>Robocalls Outlawed</u>: Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1).

Calls made by an ATDS or with a prerecorded or artificial voice are referred to as "robocalls" by the Federal Communications Commission ("FCC") and herein. Encouraging people to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

25. Rationale: In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

26. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

27. Prior Express Written Consent: The FCC has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted).

28. <u>Do Not Call Registry</u>: Additionally, the TCPA outlaws unsolicited telemarketing (robocalls or otherwise) to phone numbers on the NDNCR. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). Encouraging people to hold telemarketers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(c)(5).

**B.  The Worsening Problem of Robocalls and Spam Texts**

29. Unfortunately, the problems Congress identified when it enacted the TCPA have only grown worse in recent years.

30. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

31. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

32. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

33. In 2017, the FTC received 4,501,967 complaints about robocalls, up from 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data*

*Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc.

34. Like most other leading newspapers, *The New York Times* has been writing and reporting on the exploding number of robocall complaints filed by consumers and widespread consumer outrage about illegal telemarketing. Gail Collins, *Let's Destroy Robocalls*, N.Y. Times (Mar. 1, 2019), https://www.nytimes.com/2019/03/01/opinion/robocall-scams.html; Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

35. An Emmy-winning journalist recently observed: "Everybody is annoyed by robocalls. Hatred of them might be the only thing that everyone in America agrees on now." *Robocalls*, Last Week Tonight with John Oliver (HBO Mar. 10, 2019), *available at* https://www.youtube.com/watch?v=FO0iG_P0P6M.

36. The harm from of illegal robocalls is "is at least $3 billion per year from lost time alone." Babette Boliek & Eric Burger, *Beating Back Unwanted Robocalls*, FCC (June 5, 2019), https://www.fcc.gov/news-events/blog/2019/06/05/beating-back-unwanted-robocalls (statement of FCC Chief Economist and FCC Chief Technology Officer).

37. In fact, the wasted hours exceed such time lost outright, because "little surges of the stress hormone cortisol" from interruptions from smartphones result in elevated heart rates, sweaty hands, tightened muscles, anxiety, and distraction, a "switch cost" that weighs on a person even after the interruption ends, reducing his or her efficiency by 40%. Stephanie Stahl, *Constant Interruptions From Smartphone Can Impact Brain Chemistry, Scientists Say*, CBS Philly (May 29, 2018), https://philadelphia.cbslocal.com/2018/05/29/scientists-constant-interruptions-smartphone-impact-brain-chemistry/.

38. Robocalls are overwhelming hospitals and patients, threatening a new kind of health crisis. Tony Romm, *Robocalls Are Overwhelming Hospitals and Patients, Threatening a New Kind of Health Crisis*, Wash. Post (June 17, 2019), https://www.washingtonpost.com/technology/2019/06/17/robocalls-are-overwhelming-hospitals-patients-threatening-new-kind-health-crisis/.

39. Recognizing that the havoc wrecked by unwanted robocalls is spiraling out of control, Congress recently passed, and the President signed into law, legislation strengthening the TCPA. Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act ("TRACED Act"), 116 Pub. L. No. 105, 133 Stat. 3274 (amending 47 U.S.C. § 227).

### C. FTC Complaints about and TCPA Litigation against Datalot

40. Datalot's business is telemarketing for the insurance industry.

41. Datalot advertises its "[m]obile and web marketing solutions for the insurance industry."

42. Datalot advertises: "#1 for Qualified Inbound Calls. Simple. Self-Serve, On-Demand. 100% Contact Leads. Turn On/Off Anytime. Don't Buy Leads Buy Calls. Get $100 in Free Calls. Insurance coverage: Auto Insurance Transfers, Homeowner Insurance Calls, Commercial Ins. Transfers."

43. Consumers have been complaining to the Federal Trade Commission about Datalot's telemarketing for years.

44. On May 10, 2017, a Californian whose phone number was listed on the NDNCR complained to the FTC about Datalot's telemarketing.

45. On June 27, 2019, a person whose phone number was listed on the NDNCR complained to the FTC about Datalot as follows: "This is the latest in a series of dozens of calls, all using spoofed numbers and the CallerID of '[random city] TX';  On this call, their phone system was glitching and transferred me directly to an insurance agent who told me that the call to his office was coming from Datalot.   Between 6/21 & 6/28, I received 5 calls from this same number, and half a dozen that fit the same callerID pattern with other spoofed numbers. Pictures of my CallerID & recordings are available, if needed. --- Subject matter of the call: Insurance sales."[1]

---

[1] Certain apparent character-conversion glitches in complaints received from the FTC have been corrected in the quotations herein.

46. Datalot has been sued under the TCPA for placing telemarketing robocalls despite its knowledge that the lead generator selling Datalot the phone numbers to be called had failed to obtain valid prior express written consent to make the calls. Class Action Am. Compl. at 5-7, *Hossfeld v. Allstate Ins. Co.*, Case No. 1:19-cv-3492 (N.D. Ill. Dec. 26, 2019), ECF No. 42.

### D. TCPA Litigation against Yasha

47. Yasha's business is telemarketing.

48. Yasha's "leads" lack the requisite prior express written consent under the TCPA.

49. Yasha has been sued under the TCPA and its implementing regulations for placing telemarketing robocalls without consent. Pl.'s Original Compl. and Jury Demand at 6-9, *Cunningham v. Smoke Alarm Monitoring, Inc.*, Case 1:19-cv-07032 (E.D.N.Y. Dec. 16, 2019), ECF No. 1.

### E. FTC Complaints about and TCPA Litigation against SelectQuote

50. SelectQuote sells insurance, including term life insurance.

51. SelectQuote relies upon telemarketing to sell insurance.

52. Consumers have been complaining to the Federal Trade Commission about SelectQuote's telemarketing for years.

53. Since 2016, at least 37 complaints by people whose phone numbers were listed on the NDNCR have been lodged with the FTC about SelectQuote's telemarketing.

54. On August 1, 2016, a person whose phone number was listed on the NDNCR complained to the FTC that SelectQuote had made a "Robo-call" and "left [a] 5 minute commercial," i.e., a 5-minute prerecorded voicemail advertisement.

55. On September 6, 2017, a person whose phone number was listed on the NDNCR complained to the FTC about SelectQuote as follows: "This company claimed that they are responding to a quote request for insurance. I did not request an insurance quote from Select Quote or any other insurance company. --- Subject matter of the call: Auto insurance."

56. On November 9, 2018, a person whose phone number was listed on the NDNCR complained to the FTC that SelectQuote "has called every day since Wednesday[] despite me informing them each time that my number has been listed on our Federal Do Not Call Registry.

They are in violation of my rights and deserve to be fined for ignoring our laws. In addition, I will file another civil action law suit against them."

57. On October 1, 2019, a person whose phone number was listed on the NDNCR complained to the FTC about SelectQuote as follows: "I have received five calls from this company asking for someone named Martha. the first three calls I explained I don't know anyone named Martha. I started blocking and rejecting the calls afterward but they have persisted. Received a total of 6 calls in 48 hours all from different numbers. Last calls we[]re identified by caller ID as selectquote insurance company. they just won't stop calling this same number."

58. SelectQuote has been sued under the TCPA for placing telemarketing robocalls without prior express written consent. Am. Compl. Violation Tel. Consumer Protection Act, 47 U.S.C. § 227, *Zean v. eFinancial LLC*, Case No. 0:19-cv-02958-NEB-TNL (D. Minn. Nov. 26, 2019), ECF No. 4.

### F.    Yasha and Datalot's Automated Telemarketing for SelectQuote to Proposed Class Members

59. Some of Defendants' marketing strategies involve an ATDS.

60. Defendants use equipment that has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person).

61. Defendants call numbers even though they are assigned to cellular telephone services.

62. Defendants call numbers even though they are listed on the NDNCR.

63. Recipients of these calls, including Plaintiff, had not consented to receive them.

64. Recipients of these calls, including Plaintiff and proposed class members, had not provided prior express written consent to receive them.

65. Defendants' calls at issue were not necessitated by an emergency.

66. Defendants' calls at issue were made to numbers within the United States.

67. Violating the TCPA is profitable for Defendants.

68. SelectQuote used Datalot to conduct telemarketing for it. This telemarketing was automated and directed to people, including proposed class members, who had not provided prior express written consent to receive it.

69. Datalot used Yasha to conduct telemarketing for it. This telemarketing was automated and directed to people, including proposed class members, who had not provided prior express written consent to receive it.

### G.     Defendants' Unsolicited, Automated Telemarketing to Plaintiff

70. Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

71. Plaintiff uses a phone number that begins "(925) 735" (the "Schick Phone Number"). All calls to her referenced herein were to the Schick Phone Number.

72. The Schick Phone Number is assigned to a cellular telephone service.

73. The Schick Phone Number is used for residential purposes only and is not associated with a business.

74. It has been listed on the NDNCR since April 11, 2004.

75. Plaintiff never consented to receive calls from SelectQuote.

76. Plaintiff never gave the Schick Phone Number to SelectQuote before the call at issue.

77. Plaintiff never did business with SelectQuote.

78. On May 29, 2019, SelectQuote caused Datalot to cause Yasha to cause the Schick Phone Number to be autodialed in order to cause Plaintiff to purchase SelectQuote's products.

79. When Plaintiff answered that robocall, there was a long pause on the other end.

80. During that pause, Plaintiff said "Hello?"

81. The pause indicated that the call had been autodialed.

82. Eventually, a human came on the calling party's end of the line.

83. During the call, Plaintiff alleged that the call had been autodialed. The human did not dispute Plaintiff's allegation.

84. Autodialing is a common practice in insurance sales.

85. The purpose of the call was to sell insurance in order to generate revenue for SelectQuote.

86. During the call, SelectQuote promoted itself several times to try to get Plaintiff to buy its services. It promoted itself as "SelectQuote Insurance Services."

87. Confirming the call was from or on behalf of SelectQuote, Plaintiff received an e-mail from SelectQuote on May 29, 2019.

88. The e-mail was sent from "James.Turner@selectquote.com."

89. James Turner is an employee of Defendant.

90. The caller ID that appeared on the call was (304) 896-0957.

91. At least 30 other people have complained of receiving unsolicited calls, telemarketing, or nuisance calls from (304) 896-0957:

> Phone number 3048960957 has negative rating. 30 users rated it as negative. Approximated caller location is LOGAN, LOGAN, West Virginia. ZIP code is 25601. It's registered in LEVEL 3 COMMUNICATIONS, LLC - WV. This phone number is mostly categorized as Unsolicited call (23 times), Telemarketer (4 times) and Nuisance call (2 times).

*Who Called You from 3048960957?*, Should I Answer?, https://www.shouldianswer.com/phone-number/3048960957 (last visited Mar. 5, 2020). These complaints began at least a month before the call to Plaintiff, and they are and have been publicly available. *See id.*

92. Whitepages has receive 58 reports of "spam" calls from (304) 896-0957. *Scam or Fraud*, Whitepages, https://www.whitepages.com/phone/1-304-896-0957 (last visited July 18, 2019).

**H.   The Invasion of Privacy Caused by Defendant's Automated Telemarketing**

93. Before directing its automated telemarketing to her, Defendants never confirmed that Plaintiff had provided prior express written consent to its telemarketing.

94. The conduct alleged herein:

    a.   invaded Plaintiff's and proposed class members' privacy and solitude;

    b.   interrupted Plaintiff's and proposed class members' train of thought;

    c.   wasted Plaintiff's and proposed class members' time;

        d.      annoyed Plaintiff and proposed class members;

        e.      harassed Plaintiff and proposed class members; and

        f.      consumed the battery life of Plaintiff's and proposed class members' cellular telephones.

## I.    SelectQuote Is Vicariously Liable for its Co-Defendants' TCPA Violations

95. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

96. In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

97. The FCC has instructed that sellers such as SelectQuote may not avoid liability by outsourcing telemarketing to third parties, such as Datalot and Yasha:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

98. In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of

agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

99. SelectQuote is liable for telemarketing calls placed by Datalot and Yasha to generate customers for SelectQuote.

100. At all relevant times, telemarketing complaints lodged with the FTC have been readily available to SelectQuote via the Freedom of Information Act.

101. SelectQuote controls the day-to-day activities of Datalot's telemarketing for SelectQuote.

102. SelectQuote restricts the geographic footprint into which its telemarketing vendors, including Datalot, can cause calls to be made.

103. SelectQuote instructs its telemarketers, including Datalot, regarding certain numbers that they should or should not call.

104. SelectQuote knew or reasonably should have known that Datalot and Yasha were violating the TCPA on SelectQuote's behalf but SelectQuote failed to take effective steps within its power to cause them to stop.

105. A reasonable seller that is itself, and whose telemarketers are, the targets of repeated telemarketing complaints would and should investigate to ensure that its telemarketing complies with the TCPA.

106. Datalot executes its telemarketing by contracting with call centers such as Yasha to physically dial the call.

107. Datalot can control the equipment used for dialing, sources of data for telephone numbers, and scripting used by Yasha.

108. In fact, Datalot did exercise that control as part of the telemarketing at issue.

109. The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon

the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

## V.     CLASS ACTION ALLEGATIONS

110.  <u>Class Definition</u>: Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), Plaintiff brings this case on behalf of a class defined as follows: All persons in the United States to whom:

    a.  Defendants, any of them, and/or a third party acting on any of their behalf made a call or sent a text message;

    b.  to a cellular telephone number;

    c.  using an ATDS or an artificial or prerecorded voice;

    d.  between the date four years before the filing of the original complaint in this case and the first day of trial.

111.  Plaintiff is a member and proposed representative of the class.

112.  <u>Exclusions</u>: Excluded from the class are Defendants, any entity in which any of Defendants has a controlling interest or that has a controlling interest in any of Defendants, Defendants' legal representatives, assignees, and successors, the judges to whom this case is assigned and the employees and immediate family members of all of the foregoing.

113.  <u>Numerosity</u>: The class is so numerous that joinder of all its members is impracticable.

114.  SelectQuote claims to be the largest seller of term life insurance in the United States.

115.  Sending a robotext or placing a robocall costs less than one cent.

116.  Defendants could afford to, and did, send thousands of robocalls.

117.  <u>Commonality</u>: There are many questions of law and fact common to Plaintiff and class members. Indeed, the very feature that makes Defendants' conduct so annoying—its automated nature—makes this dispute amenable to classwide resolution. These common questions of law and fact include, but are not limited to, the following:

    a.  whether the calls were dialed *en masse* by an ATDS;

        b.      whether Defendants' desire to sell insurance constitutes an "emergency" within the meaning of the TCPA;

        c.      whether Defendants are in the United States;

        d.      whether Defendants had a pattern and practice of failing to obtain prior express written consent from people to whom they directed telemarketing;

        e.      whether Defendants had a pattern and practice of failing to remove cellular telephone numbers from their telemarketing lists;

        f.      whether Defendants had a pattern and practice of failing to remove numbers on the NDNCR from their telemarketing lists;

        g.      whether Defendants' violations of the TCPA were knowing or willful; and

        h.      whether Defendants should be enjoined from continuing to robocall and telemarket to people in violation of the TCPA.

118.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the class. Plaintiff's claims and those of the class arise out of the same automated telemarketing by Defendants and seek the same legal and equitable remedies.

119.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained competent and capable counsel experienced in TCPA class action litigation. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resources to do so. The interests of Plaintiff and her counsel are aligned with those of the proposed class.

120.    <u>Superiority</u>: The foregoing common issues predominate over any individual issues, making a class action the superior means of resolution. Adjudication of these common issues in a single action has important advantages, including judicial economy, efficiency for class members, and classwide *res judicata* for Defendants. Classwide relief is essential to compel Defendants to comply with the TCPA.

        a.      <u>Control</u>: The interest of individual members of the class in individually controlling the prosecution of separate claims against Defendants is small because the damages in an individual action (up to $1,500 per TCPA violation) are dwarfed by the cost of prosecution.

b.   <u>Forum</u>: The forum is a desirable, efficient location in which to resolve the dispute because SelectQuote is headquartered in it.

c.   <u>Difficulties</u>: No significant difficulty is anticipated in the management of this case as a class action. Management of the claims at issue is likely to present significantly fewer difficulties than are presented in many class actions because the calls at issue are automated (and thus uniform) and because the TCPA articulates bright-line standards for liability and damages.

121.   <u>Appropriateness</u>: Defendants have acted on grounds generally applicable to the class, thereby making final injunctive relief and corresponding declaratory relief appropriate on a classwide basis.

### VI.   FIRST CLAIM FOR RELIEF
**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1))**
**On Behalf of Plaintiff and the Class**

122.   Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

123.   Defendants violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to the cellular telephone numbers of Plaintiff and members of the class using an ATDS and/or artificial or prerecorded voice without prior express written consent.

124.   Plaintiff and class members are entitled to an award of $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

125.   Plaintiff and class members are entitled to and seek an injunction prohibiting Defendants and all other persons who are in active concert or participation with them from violating the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to any cellular telephone number using an ATDS and/or artificial or prerecorded voice.

### VII.   SECOND CLAIM FOR RELIEF
**(Knowing and/or Willful Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1))**
**On Behalf of Plaintiff and the Class**

126.   Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

127.     Defendants knowingly and/or willfully violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to the cellular telephone numbers of Plaintiff and members of the class using an ATDS and/or artificial or prerecorded voice without prior express written consent.

128.     Plaintiff and class members are entitled to an award of up to $1,500 in damages for each such knowing and/or willful violation. 47 U.S.C. § 227(b)(3).

## VIII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on behalf of all class members, prays for judgment against Defendants as follows:

A.     Certification of the proposed class;

B.     Appointment of Plaintiff as representative of the class;

C.     Appointment of the undersigned counsel as counsel for the class;

D.     A declaration that actions complained of herein violate the TCPA;

E.     An order enjoining Defendants and all other persons who are in active concert or participation with them from engaging in the conduct set forth herein;

F.     An award to Plaintiff and the class of damages, as allowed by law;

G.     An award to Plaintiff and the class of costs and attorneys' fees, as allowed by law, equity and/or California Code of Civil Procedure section 1021.5;

H.     Leave to amend this complaint to conform to the evidence presented at trial; and

I.     Orders granting such other and further relief as the Court deems necessary, just, and proper.

## IX.     DEMAND FOR JURY

Plaintiff demands a trial by jury for all issues so triable.

## X.     SIGNATURE ATTESTATION

The CM/ECF user filing this paper attests that concurrence in its filing has been obtained from its other signatories.

RESPECTFULLY SUBMITTED AND DATED on March 27, 2020.

By: */s/ Jon B. Fougner*
Jon B. Fougner

Edward A. Broderick, *Admitted Pro Hac Vice*
ted@broderick-law.com
BRODERICK LAW, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Anthony I. Paronich, *Admitted Pro Hac Vice*
anthony@bparonichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100

Andrew W. Heidarpour, *Admitted Pro Hac Vice*
AHeidarpour@HLFirm.com
HEIDARPOUR LAW FIRM, PPC
1300 Pennsylvania Ave. NW, 190-318
Washington, DC 20004
Telephone: (202) 234-2727

Matthew P. McCue, *Pro Hac Vice Forthcoming*
mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

*Attorneys for Plaintiff Deborah Schick and the Proposed Class*